UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELSEY ADAIR,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>DREXEL UNIVERSITY,<br><br>　　　　　　Defendant. | No. 2:18-cv-00677 AC<br><br><br>ORDER |

This matter comes before the court on defendant's motion for summary judgment. ECF No. 20. A hearing was held on October 3, 2018. ECF No. 34. Thomas Wheeler appeared on behalf of plaintiff Kelsey Adair, and Michael Vartain and Stacey Leask telephonically appeared on behalf of defendant Drexel University. Id. The parties have consented to the jurisdiction of the Magistrate Judge. ECF Nos. 6, 8, 9 (Order of Reassignment). For the reasons stated below, defendant's motion for summary judgment is GRANTED.

**I. BACKGROUND**

A. Relevant Procedural Background

Plaintiff Kelsey Adair ("plaintiff") is pursuing a putative class action against defendant Drexel University ("defendant") for false and misleading advertising of its online educational program known as the Interdepartmental Medical Science ("IMS") Certificate Program. See ECF No. 11 (First Amended Complaint). This action was originally filed in the Sacramento County

Superior Court on March 8, 2018.  ECF No. 1-1 (Exhibit A).  Defendant removed the action to this court on the basis of diversity jurisdiction.  ECF No. 1 at 1-7 (Notice of Removal).  On April 27, 2018, plaintiff filed a first amended class action complaint ("Complaint") against defendant Drexel University, and Does 1-10 inclusive, alleging three causes of action: (1) violation of the California False Advertising Law ("FAL") (Cal. Bus. & Prof. Code §§ 17500 *et seq.*); (2) violation of the Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code §§ 17200 *et seq.*); and (3) violation of Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §§ 1770 *et seq.*).  ECF No. 11 at 13-20.  Plaintiff seeks equitable relief, monetary damages, and to represent a class.  Id. at 20-21.  Defendant answered on May 31, 2018.  ECF No. 17.

B. Allegations of the Complaint

Plaintiff is a former student of Drexel Univertsity's Interdepartmental Medical Science ("IMS") Certificate Program.  She alleges that Drexel falsely advertised and misrepresented through its online advertising, to her and to other similarly situated consumers, "that its [IMS] educational program would help prepare students for medical school by having live teachers at the satellite campus, writing letters [of recommendation] for its students to aid them in obtaining medical school placement, and guaranteeing a certain number of spots" at Drexel University College of Medicine.  ECF No. 11 at 2.  In reliance on these representations, plaintiff purchased defendant's educational program for $50,000 on or around August 2014.  Id. at 6.  Classes were conducted virtually and with pre-recorded lectures from Drexel University College of Medicine; letters of recommendation were not provided to medical schools plaintiff applied to; and plaintiff was not provided an interview with Drexel University College of Medicine as guaranteed.  Id. at 6-8.  It was not until May 2015, after already purchasing the services and classes had begun, that plaintiff discovered defendant's "deception."  Id. at 7.  According to plaintiff, she failed to receive the advertised quality of classes, medical school placement assistance, an interview with Drexel University College of Medicine, and ultimately assistance in gaining acceptance into a medical school program.  Plaintiff alleges that defendant's "fraudulent practices" "constitute [] a fraudulent omission of a material fact relating to the nature and quality of its services that would be important to a reasonable consumer to know at the time they purchase Defendant's educational

2

program." Id. at 9. Finally, plaintiff summarily alleges that she, and other similarly situated consumers, would not have purchased defendant's program absent these "online representations and omissions" by defendant and its employees. Id. at 6, 14.

Defendant moves for summary judgment on all three claims, on the ground that plaintiff cannot establish that defendant made "any false, deceptive or misleading material statements that would likely deceive a reasonable consumer." ECF No. 21 at 6.

## II. STATEMENT OF UNDISPUTED FACTS

Unless otherwise specified, the following facts are either expressly undisputed by the parties or have been determined by the court, upon full review of the record, to be undisputed by competent evidence. The defendant's statement of undisputed facts is located at ECF No. 22. Plaintiff's responses are located at ECF No. 31. Defendant has also filed a response to plaintiff's statement of undisputed facts located at ECF No. 33-1.

### A. Background of Drexel University and the IMS Certificate Program

Drexel University ("University") is a private, nonprofit educational institution offering over 200 degrees at 15 colleges and schools. Declaration of Jed Shumsky ("Shumsky Decl.") at ECF No. 23-1 Exh. A at ¶8; Declaration of Martha Kaplan ("Kaplan Decl.") at ECF No. 23-2 Exh. B at ¶11. Drexel University College of Medicine ("College of Medicine") is one of the 15 colleges and schools. Shumsky Decl. at ¶9; Kaplan Decl. at ¶12. The College of Medicine operates from two principal locations in Philadelphia, Pennsylvania: the Queen Lane campus which is located in East Falls section of Philadelphia; and the Center City campus which is located near the downtown/Center City Philadephia in Pennsylvania. Shumsky Decl. at ¶10; Kaplan Decl. at ¶13. The College of Medicine educates and trains individuals seeking licensure as physicians through its Doctor of Medicine degree program. Shumsky Decl. at ¶11; Kaplan Decl. at ¶14. The College of Medicine also provides 40 different doctoral, master's, and professional development graduate programs that are separate and distinct from the Doctor of Medicine degree program. Shumsky Decl. at ¶12; Kaplan Decl. at ¶15. In particular, the College of Medicine offers the Interdepartmental Medical Science ("IMS") Certificate Program. The IMS Certificate Program is a one-year post-baccalaureate program designed for college graduates

3

intending to apply to U.S. medical schools and who wish to enhance their academic credentials in order to increase their opportunities in gaining admission to medical schools or professional health schools such as dental, optometry, podiatry, or chiropractic schools. Shumsky Decl. at ¶13-14; Kaplan Decl. at ¶16-17. In 2014-2015, the IMS Certificate Program was offered and operated in two locations: Drexel Center City Campus in downtown Philadelphia, Pennsylvania; and a satellite campus of Drexel University in Sacramento, California. Shumsky Decl. at ¶15; Kaplan Decl. at ¶19.

### B. Plaintiff's Enrollment in the IMS Certificate Program

Prior to enrolling in the IMS Certificate Program, plaintiff read online brochures from Drexel University's website. Certified Deposition Transcript of Kelsey Adair, July 20, 2018 ("Adair 2018 Depo.") at 32:13-21. Specifically, plaintiff read materials pertaining to the IMS Certificate Program as a whole, and material for the IMS Certificate Program as administered in Sacramento. Adair 2018 Depo. at 32:22-25; 33:1-7.[1] Plaintiff relied exclusively on the information provided on Drexel's website in making her decision to enroll. Adair 2018 Depo. at 33:9-12, 83:13-25, 84:14-23, 142:4-11.

On or around May 19, 2014, plaintiff applied to the IMS Certificate Program in Sacramento, California. Adair 2018 Depo at 13:15-17. After gaining admission into the program, plaintiff sent a $500 tuition deposit on or around June 4, 2014. Adair 2018 Depo. at 13:18-25, 14:1-3, Exh. 1. Classes were scheduled to begin in August 2014. Adair 2018 Depo at Exh. 1. Prior to the commencement of classes, plaintiff attended a mandatory one-day orientation for the IMS Certificate program in Sacramento, California. Adair 2018 Depo at 10:4-22, ECF No. 23-6 at 6 (Exh. F). Before attending the orientation, plaintiff read the online orientation materials to which she was directed in her admission letter from the IMS Certificate Program. Adair 2018 Depo at 12:10-14, Exh. 1.

////

---

[1] Plaintiff produced these website materials during discovery; they are located at ECF Nos. 23-4 (Exh. D), 23-5 (Exh. E), 23-6 (Exh. F). Exhibits D, E, and F are genuine copies of materials that were available on Defendant's website in 2014. Shumsky Decl. at ¶¶26-33. The same materials were discussed at plaintiff's deposition. See Adair 2018 Depo. at Exhs. 5, 6, 7.

4

C. Plaintiff's Participation in the IMS Certificate Program Orientation

The orientation materials provided an overview of the academic year. Adair 2018 Depo. at Exh. 4. At her deposition, plaintiff confirmed that these orientation materials were displayed during the orientation she attended. Adair 2018 Depo. at 37:5-9, 43:4-7, 44:5-8. The orientation materials included a breakdown of the course by Fall and Spring semesters with a denotation of whether each course was to be conducted as a "small group conference," "virtual lab," and/or in "small and large groups." Adair 2018 Depo at Exh. 4. Cellular Biology & Microanatomy I, Cellular Biology & Microanatomy II, and Medical Neuroscience were all denoted as "virtual labs." Id.[2] Microanatomy included teaching faculty Catherine Tamse, Ph.D. who was available onsite at Sacramento to answer questions during microanatomy labs, run a mini-review at the end of every lab, conduct scavenger hunts, and score lab exams for Sacramento students. Id. Digital resources for the course included a "virtual microscope," "interactive lab manual," and "virtual slide box" to complete the virtual lab. Id. At plaintiff's deposition, she recalled that orientation had included review of how classes would be conducted. Adair 2018 Depo at 20:20-22. Specifically, plaintiff testified the orientation discussed how the Microanatomy "scavenger hunts" would be conducted in groups, and "that it would be kind of a test where we would look at different things under [the] microscope. We [had] to be able to identify different types of cells, for example." Adair 2018 Depo at 20:22-25, 21:1-2.

Orientation materials also included a section relating to the return of exams, which provided that "official exam reviews for IMS/DPMS students are scheduled throughout the year. Official exam reviews will be the only time that students will be allowed to view the exam questions unless they make arrangements with the course director on an individual basis." Adair 2018 Depo Exh 4.

Withdrawal and refund policies were also provided in the Health Sciences Student Handbook for the Drexel University Office of Professional Studies. See ECF No. 23-7 at 10. At

---

[2] Cellular Biology & Microanatomy I was to be held in the fall semester and Cellular Biology & Microanatomy II and Medical Neuroscience were to be held in spring semester. Adair 2018 Depo. at Exh. 4.

oral argument on the motion, the undersigned asked whether plaintiff could have received a full refund after attending orientation. Defense counsel stated that according to the policy, plaintiff could have received a full refund at any time prior to the start of classes. Plaintiff did not dispute this representation, and it is accepted as fact.

Classes commenced the Monday following orientation. Adair 2018 Depo. at 103:10-17. Plaintiff attended classes beginning on the first day. Id.

### C. Evidence Related to Plaintiff's Claims

#### 1. *Letters of Recommendations & Assignment of Advisors*

The University website did not state that the University would provide "letters of recommendation" to IMS students for their use in seeking medical school admission. ECF No. 23-5 at 5 (Exh. E); Kaplan Decl. at ¶72; Shumsky Decl. at ¶68. The University's online materials stated that faculty advisors would write a "letter of evaluation," and stated as follows: "Students in the Interdepartmental Medical Science program are assigned a faculty advisor who will meet with the student regularly and eventually write a letter of evaluation for application to health professional schools." ECF No. 23-5 at 5 (Exh. E); Shumsky Decl. at ¶62; Kaplan Decl. at ¶72. Plaintiff testified at her deposition that she was assigned Sacramento faculty advisors. Adair 2018 Depo. at 21:3-7; 27:5-7. In January or February 2015, plaintiff testified that she had requested her faculty advisor to write a letter of evaluation in support of her medical school applications. Adair 2018 Depo. at 166:25; 167:1-4. However, because plaintiff was on academic probation, she and her faculty advisor, Dr. Giordano, jointly decided not to send the letter to potential schools until the academic probation had been resolved. Adair 2018 Depo. at 168:4-16, 171:10-25, 172:13-24. Plaintiff never went back to Dr. Giordano to follow up on her request. Adair 2018 Depo. at 173:14-22. In February 2015, plaintiff had requested a letter of evaluation from Dr. Shumsky. Adair 2018 Depo. at 174:10-15.[3] Dr. Shumsky was not plaintiff's faculty advisor. Adair 2018 Depo. at 174:2-5. Dr. Shumsky was also willing to write plaintiff a letter, but never did so because plaintiff failed to follow up with Dr. Shumsky regarding resolution of

---

[3] The deposition transcript misspells Dr. Shumsky's name as Shumsky. The court uses the correct spelling. See ECF No. 23-1 (Declaration of Jed Shumsky, Ph.D.).

6

her academic probation. Adair 2018 Depo. at 174:16-22, 175:12-25, 176:1-2.

    2.    *Placement Assistance*

Drexel's online materials did not state that the University would provide IMS students with "placement assistance" for medical school. Shumsky Decl. at ¶¶33, 70; Kaplan Decl. at ¶¶37, 74. The website section entitled "Placement Information" specified that successful completion of the IMS Certificate Program does not guarantee admission to any medical or professional health school.:

> PLACEMENT INFORMATION Admission into a medical school or other health professional school depends on a number of factors in addition to academic performance. Therefore, satisfactory academic performance in our programs does not guarantee admission to a health professional school. While our programs have successfully helped students strengthen their candidacy for medical school application, many students have also been accepted to other professional school programs after completing one or two years of the program.

ECF No. 23-6 (Exh. F). Shumsky Decl. at ¶33; Kaplan Decl. at ¶37.

    3.    *Live Lectures*

Drexel University's online materials did not state that IMS Certificate Program students in Sacramento would receive "live lectures." ECF Nos. 22 at 2, 31 at 2, Adair 2018 Depo. at 157:10-12. The website stated that lectures given by Drexel University's College of Medicine faculty to the first-year medical students at the medical school's Queen Lane campus would be recorded and transmitted via video for the IMS Certificate Program students in Sacramento. ECF Nos. 22 at 2; 31 at 2; Shumsky Decl. at ¶¶63-64; Kaplan Decl. at ¶¶67-68. The website stated "Classes will be taught by members of faculty of the Drexel University College of Medicine…in Philadelphia, using the state-of-the art, high-definition videoconferencing system and streaming video at Drexel's high-tech Graduate Center in Sacramento. Students will also have conference sessions with College of Medicine faculty using the same technology." ECF Nos. 22 at 2-3; 31 at 2; 23-5 at 4 (Exh. E). "The College of Medicine lectures are simulcast…from the Queen Lane Campus. The lectures are also available via streaming video in the evening of the day they are presented to the class. This allows for repetition and reinforcement of the lecture material." ECF Nos. 22 at 2-3; 31 at 2; 23-6 at 5 (Exh. F).

4. *Guaranteed Interviews*

Drexel University's online materials specified that not all IMS Certificate Program students were guaranteed an interview with Drexel University's College of Medicine. Students were required to meet a certain set of requirements. The materials stated that an interview was guaranteed "for students earning grades of B or better in all fall courses and an incoming MCAT score of 27 (9's in each section) or a 30 with no score less than a 7 (US Citizens or permanent residents only)[.]" ECF No. 23-5 at 2 (Exh. E), 23-6 at 5 (Exh. F).

On or around May or June 2014, plaintiff filed a primary application to Drexel University College of Medicine. Adair 2018 Depo. at 89 at 7-11. At the time, plaintiff was not enrolled in the IMS Certificate program. Adair 2018 Depo. at 87:15-20. Plaintiff was never automatically "prompted" to submit a secondary application for the College of Medicine after her initial submission, due to a "hiccup" in the application process. Adair 2018 Depo. at 90:14-23. On or around January or February 2015, plaintiff contacted Drexel University to ask about filing a secondary application. The University indicated that it was too late in the process for plaintiff to submit a secondary application, but that plaintiff "could still technically fill out one[.]" Adair 2018 Depo. at 93:9-18. Plaintiff did not fill out a secondary application because she "thought" that it would be "throwing away additional application funds" due to a lot of classes being already full. Adair 2018 Depo. at 93:18-25, 94:4. By the end of the fall semester, however, plaintiff had received a C in Medical Biochemistry, C+ in Medical Physiology, and a C+ in Medical Immunology I, and had been placed on academic probation due to having a GPA of 2.53. Adair 2018 Depo. at Exh. 4.

5. *Live Labs*

The program materials stated that the IMS Certificate Program was presented "[u]sing symptom-based modules, basic science and clinical faculty present information from the biomedical and clinical sciences in a lecture-based and hands-on format." ECF No. 23-6 at 4 (Exh. F). Specifically, "course conferences and laboratory components for Interdepartmental Medical Science students are conducted at the Center City Campus by the medical school faculty." ECF No. 23-4 at 4 (Exh. D); see also ECF No. 23-6 at 5 (Exh. F) ("Course conferences

and laboratory components for the students are held in-person within small groups at the Center City Campus."). IMS Certificate Program students in Sacramento would have conference sessions with Drexel University College of Medicine faculty using "state-of-the-art, high definition video-conferencing system and streaming video" technology. ECF No. 23-5 at 4 (Exh. E). This technology was the same used to stream classes to Sacramento from Philadelphia. Id. The Philadelphia faculty was "supplemented by Sacramento resident faculty" that served as faculty advisors and provided a review program for Sacramento students. Id. Students were further notified at orientation that course conferences and laboratories would be conducted in the same manner as the course lectures – by video/audio technology." Shumsky Decl. at ¶ 66. "Students were also reminded that labs would take place 'virtually from the Sacramento campus for such designated course and include students using 'virtual microscopes' whereby students were provided links to digital images of slides for laboratory exercises." Kaplan Decl. at ¶52. Orientation materials further noted that classes such as Cellular Biology and Microanatomy I, Cellular Biology and Microanatomy II, and Medical Neuroscience would be "virtual labs." Adair 2018 Depo. at Exh. 4.

      6. *Exam Reviews*

The online materials stated:

> The exact same examination and quizzes that the medical school students take are administered to the IMS [] program students. The program students are evaluated based on the performance of the first-year medical school students. The final mean of the medical school class determines the letter grade of a B in the course for the IMS [] program students. The goal of the IMS [] program students is to attain test and quiz scores at or above the mean on each exam. Final grades will not be determined until the course is complete.

ECF No. 23-6 at 5 (Exh. F). The website is silent as to whether students are able to review their exams. However, the University had a policy of "not permitting review of the examination questions after the test had been taken by the students" "so as to avoid unfair advantage to students who complete the IMS Certificate Program and then go on to matriculate in the University's College of Medicine medical degree program." Shumsky Decl. at ¶¶50, 53; see also Kaplan Decl. at ¶83 ("[T]he purpose of the policy was to preserve the integrity of examination

9

questions so that they may be used again in the future."). As an alternative, "the University conducted exam review sessions with students." Shumsky Decl. at ¶53; Kaplan Decl. at ¶83. The orientation materials provided students with information regarding these official exam reviews. See Adair 2018 Depo. at Exh. 4. Specifically, the orientation materials stated that "official exam reviews for IMS/DPMS student are scheduled throughout the year" and "official exam reviews will be the only time that students will be allowed to view the exam questions unless they make arrangements with the course director on an individual basis." Id.

### III. MOTION FOR SUMMARY JUDGMENT

Defendant moves for summary judgment on grounds that plaintiff cannot establish that defendant made "false, deceptive or misleading material statements that would likely deceive a reasonable consumer" through its online advertising of its educational program. ECF No. 21 at 6. The court agrees that judgment must be entered for defendant as a matter of law.

A. Legal Standard for Summary Judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party may move for summary judgment, identifying each claim . . . or the part of each claim . . . on which summary judgment is sought. Id. A material fact is one that could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. Id. In summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. In such cases, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," Anderson, 477 U.S. at 248 (1986); see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," Anderson, 447 U.S. at 248.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968)). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."

Matsushita, 475 U.S. at 587 (citation and internal quotation marks omitted).

To establish a genuine dispute of material fact, a plaintiff must present affirmative evidence; "[b]ald assertions that genuine issues of material fact exist are insufficient." Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007). "In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." Walls v. Cent. Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank, 391 U.S. at 289). Indeed, "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to overcome a motion for summary judgment. Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 447 U.S. at 252). "[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

B. Standards for Liability Under the FAL, the UCL, and the CLRA

The California False Advertising Law makes it "unlawful for any person, firm, corporation, or association, or any employee" to "induce the public to enter into any obligation" based on a statement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

> The statute has been interpreted broadly to encompass not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public. Consequently, even a perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as

> by failure to disclose other relevant information, is actionable under this section.

Davis v. HSBC Bank Nevada, N.A., 691 F.3d 1152, 1162 (9th Cir. 2012) (internal quotation marks and citations omitted).

The Unfair Competition Law provides "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The statue is violated where "a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation of [FAL]." Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 731 (9th Cir. 2007). "Each prong of the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an independent basis for relief." Id. Accordingly, "[a]ny violation of the false advertising law necessarily violates the []UCL." Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (citing Kasky v. Nike, Inc., 27 Cal.4th 939, 950 (2002) (internal quotation marks omitted).

The Consumer Legal Remedies Act prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 1770. Specifically, in relevant part, the CRLA prohibits against "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another[,]" "[a]dvertising goods or services with intent not to sell them as advertised[,]" "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law[,]" and "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code §1770(a)(7), (9), (14), (16). "An omission is actionable under the CLRA if the omitted fact is (1) contrary to a material representation actually made by the defendant or (2) is a fact the defendant was obliged to disclose." Gutierrez, 19 Cal. App. 5th at 1258.

All three California statutes are governed by the "reasonable consumer" test. Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008). "Under the reasonable consumer standard, [plaintiff] must show that members of the public are likely to be deceived." Williams v. Gerber Prod. Co., 552 F.3d 934, 938 (9th Cir. 2008) (internal quotation marks and citations omitted).

"The California Supreme Court has recognized that these laws prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Id. (citing Kasky, 27 Cal.4th at 951) (internal quotation marks omitted). "The reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" Ebner v. Fresh, Inc., 838 F.3d 958, 965 (9th Cir. 2016) (citing Lavie v. Procter & Gamble Co., 105 Cal.App.4th 496, 495 (2003).

### C. Plaintiff Has Failed to Establish a Triable Factual Dispute Regarding Deceptive or Misleading Advertising

Plaintiff conceded in her briefing and at oral argument that her allegations regarding letters of evaluation (or letters of recommendation), placement assistance, assignment of advisors, live lectures, and guaranteed interview, do not present any triable issues of material fact under the FAL, UCL and CLRA. See ECF No. 30 at 6 n.2. This concession is appropriate, as the evidence entirely fails to support the allegations of the complaint as to Drexel's representations regarding these matters. In opposition to summary judgment, plaintiff accordingly re-focuses her case on Drexel's alleged misrepresentations regarding live labs and exam reviews.[4] ECF No. 30 at 10-17. However, the evidence fails to support plaintiff's characterization of defendant's online advertising of its Sacramento-based IMS program as deceptive or misleading as to these matters.

Plaintiff contends that defendant made an "affirmative representation that labs would be presented at both the Philadelphia and Sacramento campuses" in the same way, and that by failing to disclose the distinction between "virtual labs" at the Sacramento Campus and "live labs" at the Philadelphia Campus, defendant misled plaintiff regarding the nature and quality of

---

[4] The First Amended Complaint alleges as the basis of liabiity that plaintiff relied on defendant's advertising and online information in deciding to purchase defendant's educational services, and would not have purchased the IMS program had she known that the nature and quality of defendant's program was different than advertised. See ECF No. 11 at ¶¶34, 38, 43. Plaintiff's specific allegations regarding live lectures, placement assistance, letters of recommendations, and guaranteed interviews to the University's College of Medicine, were offered in support of her overall theory. Although the newly proffered facts regarding labs and exam reviews were not alleged in the complaint, the court assumes for present purposes that they would nonetheless be admissible as evidence in support of the original theory of liability.

14

the IMS program. ECF No. 30 at 11-12, 14-16. Plaintiff proffers the following statements as evidence: "[c]ourse conference and laboratory components for the students are held in-person within small groups at the Center City Campus[;]"[5] and "[s]mall group conferences and labs will be presented at the Center City or Sacramento campus for each of the designated courses and are not available for streaming video."[6] This evidence is insufficient to raise a triable issue of material fact regarding the advertising of "live labs."

Even if defendant's online description could fairly be characterized as ambiguous as to the form of labs offered at the Sacramento campus, any such ambiguity falls short of creating a triable issue of fact regarding the false or misleading nature of the purported statements. First, the IMS program materials specified that labs were conducted at the Center City Campus by medical school faculty. ECF No. 23-4 at 4 (Exh. D); see also ECF No. 23-6 at 5 (Exh. F). Online references to the Center City Campus in Philadelphia could not reasonably be interpreted to apply equally to the Sacramento campus.

Second, plaintiff was expressly informed at orientation that labs for the Sacramento campus would be "virtual labs." Orientation materials indicate that the classes for the program that involved labs were designated with an "L" symbol, denoting that it was a "virtual lab." Adair 2018 Depo. at Exh. 4. There was a portion in the orientation materials strictly dedicated to "microscopic anatomy" that broke down access to various digital resources, identified the faculty that would be conducting the labs, the "virtual microscope," and the necessary computer requirements. Id. All of this information is consistent with a virtual lab, and renders unreasonable any belief that the labs would be live. Plaintiff also affirmatively testified at her deposition that she was told the microanatomy labs would be conducted *in Philadelphia*, with a faculty member available in Sacramento to take questions from the Sacramento students. Adair 2018 Depo. at 46:3-19. This representation was consistent with the advertising materials indicating that the Sacramento resident faculty would supplement Philadelphia faculty, serving as resident faculty advisors and providing a review program. ECF No. 23-5 at 4 (Exh. E). On the

---

[5] ECF No. 23-6 at 5 (Exh. F).
[6] ECF No. 23-7 at 26 (Exh. G).

evidence as a whole, the court concludes that no reasonable consumer could be misled by defendant's representations into believing that Sacramento students would be participating in live labs.

Any ambiguity regarding the form of labs for Sacramento students was cured at orientation. By the end of orientation, plaintiff was expressly and fully informed as to the nature of the labs in which she would participate. At that point, if live labs were crucial to her decision to enroll, she could have requested a full refund and withdrawn from the program. Plaintiff made no such request. Accordingly, she cannot demonstrate that she detrimentally relied on her belief that she would be participating in live labs, and she cannot show that she suffered an injury.

Lastly, plaintiff contends that defendant falsely represented that students in the IMS program would be afforded the same advantages and opportunities as Drexel's first-year medical students, including the ability to review past exams. ECF No. 30 at 12-13. Plaintiff contends that by advertising that students were "taking medical school courses" which would permit "medical school admissions committees to directly evaluate the student's competence compared to those already in medical school," defendant effectively represented that IMS students, like medical students, would have access to prior exams in order to improve future test performance. Id. at 13. The only evidence of this that plaintiff identifies is Drexel's representation that "[t]he exact same examinations and quizzes that the medical school students take are administered to the IMS [] program students. The program students are evaluated based on the performance of the first-year medical school students." ECF No. 23-6 at 5. Plaintiff points to no representations about the IMS program that expressly mention exam reviews.

Plaintiff does not dispute the nature and quality of the exams administered, or their identity with medical school examinations, but only challenges her limited access to past exams. Orientation materials clearly indicated that students would only be allowed to view exam questions during the official exam reviews scheduled throughout the year. Adair 2018 Depo. at Exh. 4; see also Kaplan Decl. at ¶ 83. On this record, no jury could find a misleading representation regarding IMS student access to their past exams.

////

16

To defeat summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" Anderson, 477 U.S at 252 (citation omitted). In this case, plaintiff's evidence of misrepresentation is no more than a scintilla; a reasonable jury could not find any misrepresentation or deceptive advertisement by a preponderance of the evidence. Put another way, plaintiff's evidence could not lead a rational trier of fact to conclude that a significant portion of potential students could be misled by Drexel's marketing of its IMS program. See Ebner, 838 F.3d at 965. Accordingly, plaintiff's FAL, UCL, and CLRA claims fail as a matter of law, and defendant is entitled to summary judgment.

### D. Class Action Allegations

Because plaintiff's individual claims fail as a matter of law, the putative class action does not survive. Fed. R. Civ. Pro. 23(a). Plaintiff agrees. ECF No. 30 at 6 n.2 ("Plaintiff agrees with Defendant that should Defendant succeed on its Motion for Summary Judgment as a whole, the putative Class claims would be dismissed without prejudice for lack of standing.")

### IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment (ECF No. 20) is GRANTED in full;
2. The putative class claims are dismissed without prejudice;
3. Judgement is to be entered in favor of Defendant Drexel University;
4. The Clerk is directed to close the case.

DATED: January 14, 2019

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE